Raymond W. KIESS, Plaintiff-Appellant,

v.

Willard D. EASON, Frederick Kavanagh
and Bio-Dynamics, Inc., Defendants-
Appellees.

No. 18533.

United States Court of Appeals,
Seventh Circuit.

May 10, 1971.

Hamilton Smith, William G. Migely, Chicago, Ill., Melvin M. Belli, San Francisco, Cal., Henry E. Bradshaw, Indianapolis, Ind., Robert L. Lieff, San Francisco, Cal., James E. Betke, Chicago, Ill., for appellant; Belli, Ashe, Ellison, Choulos & Lieff, San Francisco, Cal., Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., McDermott, Will & Emery, Chicago, Ill., of counsel.

James L. Beattey, Indianapolis, Ind., Howard Neitzert, George A. Platz, Chicago, Ill., for appellees, Willard D. Eason and Frederick Kavanagh; Martz, Beattey, Hinds & Wallace, Indianapolis, Ind., Sidley & Austin, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, and KERNER and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Appellant is a former shareholder of Bio-Dynamics, Inc. He contends (1) that he was entitled to more stock than he received, and (2) that he was injured by selling the shares he did receive. Federal jurisdiction is predicated on diversity of citizenship. If his claims are valid as a matter of Indiana law, in view of the extraordinary growth of Bio-Dynamics he should recover approximately sixteen million dollars.

After filing an amended complaint, plaintiff conducted extensive discovery and testified at length in a deposition taken by defendants. On the basis of the voluminous record thus developed, the district court concluded that the undisputed facts foreclosed recovery, and entered summary judgment in favor of defendants.

Inevitably in a record of this magnitude the parties' versions of the facts will differ. The same events will be described or recalled differently by different witnesses. What is innocuous to one may appear sinister to another. Such differences do not preclude summary judgment, however, unless they are material to the outcome. See Ashwell & Company v. Transamerica Insurance Co., 407 F.2d 762 (7th Cir. 1969); cf., First National Bank v. Cities Service Co., 391 U.S. 253, 288, 290, 88 S.Ct. 1575, 20 L. Ed.2d 569. We have read the portions of the record to which plaintiff has directed our attention and, accepting his version of the evidence as we must, United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176, we have concluded that summary judgment was properly entered.

I.

There are two chapters to the story. The first relates to plaintiff's acquisition of Bio-Dynamics stock; the second to his disposition of those shares. In each chapter we state only the essential facts. As stated, they are either uncontradicted or, if disputed, we relate plaintiff's version.

A.

Plaintiff is a person of superior intellectual ability. He conceived and developed a simplified system for making

blood tests. His "Unitest System," [1] when marketed, received prompt nation-wide commercial acceptance.

After the system was substantially developed, but before it was placed on the market, plaintiff received some assistance from defendants Eason and Kavanagh. In the summer of 1962 plaintiff told Eason about the system he had been working on for several years, but Eason did no work on it until February 12, 1963. His contribution to the system was relatively minor. Plaintiff and Eason never entered into an agreement with each other relating either to the Unitest System or to sharing the fruits of its development.[2]

In May, 1963, at plaintiff's request, defendant Kavanagh began work on a colorimeter to be used in conjunction with the system. Compared to plaintiff's contribution to the system, the importance of Kavanagh's work was relatively minor. There was no agreement between plaintiff and Kavanagh concerning the compensation Kavanagh would receive for his efforts.

Prior to June 19, 1963, plaintiff furnished materials to counsel in connection with the preparation of an application for a patent on the Unitest process. The application was filed on December 18, 1963; plaintiff was represented to be the sole inventor of the system.

Plaintiff arranged for the organization of Bio-Dynamics, Inc. on February 28, 1964, to manufacture and market devices incorporating the Unitest System. The incorporators were plaintiff, Eason and Kavanagh; the original paid-in capital was represented by certain test equipment and prototypes owned by the incorporators on which the directors placed a valuation of $1,350. Plaintiff testified that everyone understood "that as an inducement to investing, the patent application would be assigned to the corporation."

The first board of directors included plaintiff, Eason, and Kavanagh, and two outside directors. Plaintiff was elected president, Eason secretary, and Kavanagh vice president. No formal action with respect to the issuance of stock to the incorporators was taken prior to July 18, 1964. There were, however, discussions in which plaintiff stated that 8,000 of the 10,000 authorized shares should be issued to him; he offered 5% of that amount to Kavanagh, who said "the offer was generous." By July 18, 472 shares had been sold to investors for $47,200.

At a board meeting attended by all five directors and corporate counsel on July 18, 1964, the issuance of stock was discussed at length. Plaintiff, who presided, requested counsel "to discuss his views concerning the issuance and distribution of corporate stock to officers as payment for services rendered in the organization, promotion and development of the corporation and its products." Counsel expressed the opinion that additional financing was absolutely necessary; that such financing would require registration under the Indiana Securities Law; and that "a public registration would be refused if the organizers, promoters and developers were issued and paid stock in excess of 35% of authorized corporate stock."

Counsel then recommended that 2,000 shares be issued to plaintiff and 1500 shares be divided between Eason and Kavanagh. Plaintiff objected that 2,000 shares did not adequately reflect his contribution to the Unitest System and made a presentation to the board. During the discussion which followed, Eason asserted that he had a right to receive the same number of shares as plaintiff. He

---

1. As developed, the system permitted a blood test to be conducted in a doctor's office in minutes by adding a sample of blood to re-agents prepackaged in a disposable vial, placing the vial in a colorimeter or readout device, reading the results, and throwing the vial away.

2. Plaintiff and Eason did have a written agreement giving each an equal interest in an unrelated idea which apparently never ripened.

stated that he had an agreement with plaintiff providing that their interests in the corporation should be equal; Eason's statement was not true and plaintiff so advised the directors who were present. Ultimately a motion was made by one of the independent directors that 1,500 shares each be issued to plaintiff and Eason and 500 shares be issued to Kavanagh "for services heretofore rendered in the organization, promotion and development of the corporation and its products." The motion was adopted by a vote of 4 to 1, with plaintiff opposing the motion.

Immediately after the meeting, plaintiff expressed his dissatisfaction to corporate counsel, stating that he did not believe his interests had been adequately considered. Counsel replied simply, "It's been done," and added that nothing could be done to reverse the decision.

In due course, stock certificates in the amounts voted by the directors were issued to the incorporators and signed by plaintiff as president of the company. Subsequently plaintiff commented to others about the unfairness of the allocation.

On September 26, 1964, plaintiff assigned the patent application on the Unitest System to the corporation. The assignment represented that he was the owner of the entire right, title and interest in the application and the invention covered thereby; the transfer to the corporation was unconditional.

In October, 1964, the shareholders amended the Articles of Incorporation to authorize the issuance of 200,000 shares in order to effect a 20 for 1 stock split. Fifty thousand additional shares were issued, registered, and offered to the public. In connection with these transactions, in his capacity as president of the corporation plaintiff signed various documents which described the number of shares owned respectively by Eason, Kavanagh, and himself. In addition, he filed an individual statement with the Indiana Securities Commission in which he was required to describe fully his interest in stock or other securities of the corporation. He then stated under oath that he owned 1500 shares, that he had no written contract for additional stock or other securities of the issuer, nor any contract or agreement for additional compensation.

Pursuant to the stock split, the number of shares which he owned was increased from 1,500 to 30,000; comparable increases were, of course, realized by Eason and Kavanagh. The annual report to the stockholders which was distributed in early 1965 and signed by plaintiff accurately described their respective stock ownerships.

## B.

The company's prosperity was prodigious. Nevertheless, friction developed between plaintiff and Kavanagh, and also between plaintiff and Eason.

In January, 1965, Kavanagh called an informal meeting of all directors except plaintiff and told them that plaintiff should be removed as president. At the formal meeting of the board held on March 17, 1965, for the purpose of selecting a slate of directors for the following year, plaintiff invited Kavanagh to express his complaints about management. Kavanagh declined. All of the directors proposed by plaintiff, including Kavanagh, were reslated. However, at the directors meeting three days later, Kavanagh was not reelected vice president. Beginning in April, Kavanagh had numerous conversations with one of the other directors (Huddleston), repeatedly espousing the desirability of "getting rid of" plaintiff.

In September plaintiff discharged an engineer named Schmitz. The details of the discharge are discussed at length, but we may assume that plaintiff's action was entirely proper,[3] although Eason and Kavanagh thought it was unwise.

---

3. Schmitz had disregarded certain instructions given him by plaintiff. Shortly after the discharge, plaintiff received a letter from the president of a former employer of Schmitz describing him as "one of the most insubordinate persons with whom I have ever dealt."

On Saturday, September 25, a few days after the discharge, an informal meeting of the directors, with corporate counsel present, was held. It was decided that plaintiff would take a 90-day leave-of-absence beginning on the following Monday. While on leave, plaintiff was to be paid his regular salary and a reasonable traveling allowance. It was further agreed that in his absence Eason would perform the duties of chief executive officer of the corporation, and at the end of plaintiff's 90-day leave, Eason would take a similar leave and plaintiff would resume the duties of chief executive. During the 180-day period covered by the two leaves, neither plaintiff nor Eason would lose or acquire any office in the corporation; each, while on leave, was to refrain from participation in corporate business except that involved in attending directors meetings or visiting distributors of company products. The directors also expressed their intention to "study the corporation's management structure during the 180-day period beginning on September 27, 1965."

On Monday, September 27, 1965, the first day of his leave of absence, plaintiff talked to a broker about selling some of his stock. The next morning he breakfasted with another broker who agreed to sell 3,000 shares for him.

A formal meeting of the board of directors was held on October 1, 1965, pursuant to a call issued by plaintiff. After a discussion of plaintiff's status, the directors adopted a resolution [4] fixing the period of his leave-of-absence as September 27, 1965, to December 31, 1965, and providing that he should not participate in corporate business except as directed by other officers. The resolution also stated that the terms of a substantially similar leave-of-absence for Eason would be fixed at a directors meeting on or before December 31, 1965.

After the meeting, plaintiff made an entry in his diary reading in part:

"It strongly appears to me that as of now I am out and Bill E. is in. It is probably all for the best. * * * The Company is now going down the drain. *Must divest myself of all my stock in the Company.* * * * Fred K. and Bill E. are psychotic. Dan H. is not far behind. * * *" (Emphasis added.)

He changed his mind, however, and did not sell any more stock during 1965.

On November 11, 1965, Kavanagh and Eason met with Dr. Charles Boswell, a member of a firm of industrial psychologists, for the purpose of discussing management problems at Bio-Dynamics. They told Boswell that the meeting was sanctioned by the board of directors and had been discussed and voted upon at a previous meeting of the board. These statements were not true.[5] Kavanagh and Eason made it clear to Boswell that they felt the primary problem at Bio-Dynamics was what ought to be done about plaintiff, and that Boswell's assignment was to determine whether plaintiff was capable of effective performance as head of the company. Boswell was asked to send the bill for his services to Kavanagh's residence.

At a formal directors meeting on November 13, 1965, Director Huddleston suggested the employment of a firm of management or business consultants to study the management problems that had been the subject of the special meeting on October 1, 1965. After a lengthy discussion, the board unanimously resolved to employ a consultant to make findings and recommendations regarding the com-

---

4. "3. During the period of his leave, Mr. Kiess shall not participate in the conduct of the business of the Corporation otherwise than by performing those duties that may reasonably be assigned to him by the officers of the Corporation other than himself and by participating in meetings of the Directors of the Corporation."

5. Apparently the previous meeting of the board was on October 14, 1965, when the directors were concerned with the consequences of the death of Director Surface. At that meeting Eason resigned as secretary.

pany's management structure, and to accept the findings and recommendations of that consultant. Unaware of the meeting with Boswell which had taken place two days earlier, and which was not mentioned in the directors meeting, plaintiff voted in favor of the resolution. Kavanagh and Huddleston were authorized to select the consultant. Boswell's firm was employed.

Boswell interviewed the company's key personnel. Both plaintiff and Eason were tested and interviewed extensively. The details of various management decisions, such as the discharge of Schmitz, were reviewed in depth by Boswell. On December 14, 1965, he presented his report to the board of directors; the report recommended the removal of plaintiff as president.

At Boswell's suggestion, plaintiff and Eason left the room during the presentation and discussion of the report; neither of them returned prior to the adjournment of the meeting. In their absence the board unanimously adopted a resolution removing plaintiff as president of the corporation as of January 1, 1966, providing that his salary continue through March 31, 1966, and that he be offered a position as consultant for the period April 1, 1966, through December 31, 1966, at a fee or salary to be agreed upon. Eason was then named executive vice president.

After the meeting one of the directors advised plaintiff that a motion had been adopted on "the stipulation that [he] would be able to make a statement at the next board meeting in rebuttal or in defense of some of the allegations that were presented."

The following day plaintiff read the Boswell report in counsel's office. He then prepared a 6-page written memorandum which he read to the board at a special meeting on December 20, 1965. He stated that although he had consented to the employment of a business consultant, he had not agreed that a psychologist be engaged instead. He criticized the Boswell report as slanted and inac-

curate, and expressed the intention to hold Boswell and any person supplying him with libelous information fully accountable. After discussion, plaintiff suggested an investigation of corporate affairs by Directors Huddleston, Kalanzis, and Nickel. In due course Huddleston moved that the corporation continue to operate "as at present" until January 15, 1966, and that prior thereto the committee suggested by plaintiff make an investigation and report their recommendations to the board. The motion was carried by a vote of 5 to 1, with Kavanagh dissenting.

On January 15, 1966, the report of the committee was presented to the board. The committee recommended that the by-laws of the company be amended to change the responsibilities of the president. Under the amended by-laws, the president would serve as a consultant and not have the normal responsibilities of a chief executive officer. The committee's recommendations were adopted by a vote of 4 to 2. Plaintiff and one of the members of the committee voted against the resolution, stating that they disagreed to the extent that the limitations on the authority of the president were to continue beyond the date of the next annual meeting of shareholders; they both, however, agreed to cooperate in effectuating the recommendations contained in the report.

Although the minutes contained no resolution formally rescinding the action taken on December 14, 1965, it is apparent that all directors assumed that plaintiff continued in office as president after the meeting of January 15, 1966. Nevertheless, his conclusion that he was no longer the chief executive officer, which he had noted in his diary on October 1, 1965, had apparently been confirmed. He proceeded to sell the remainder of his stock in the company; by April 14, 1966, he had sold it all.

On April 16, 1966, over the dissent of Eason and Kavanagh, the board decided to recommend the reelection of all directors, including plaintiff, at the annual

meeting of stockholders on April 23, 1966. They also agreed to announce at the meeting that they would recommend the reelection of all incumbent officers of the corporation for the ensuing year. However, when the directors reconvened on April 22, counsel expressed the opinion that under the by-laws a director who had ceased to own at least 25 shares was no longer qualified to serve as a director. The board then rescinded its prior action. Plaintiff was not reelected at the annual meeting and did not thereafter hold any office in the company.

Plaintiff realized $461,463.75, virtually all profit, from the sale of his 30,000 shares. If he had retained his stock, its value on the date the amended complaint was filed would have been approximately $13,680,000.[6]

## II.

The story of what might have been is sad. But in business, as in litigation, certain decisions eventually attain finality. We are satisfied that the undisputed facts require finality to attach to (a) plaintiff's decision to accept 1,500 shares of Bio-Dynamics stock as compensation for his interest in the Unitest System, and (b) his decision to sell out when he did.

## A.

The district court identified four different bases for defeating plaintiff's first claim: (1) assuming, as plaintiff argues, that the three parties made no agreement on allocation of the 3,500 shares, the court cannot make an agreement for them;[7] (2) absent an express agreement among the three, the law would imply an equal partnership among the owners of the system, which would give plaintiff a lesser number of shares

than he actually received;[8] (3) no fraud claim can be supported because of the absence of evidence of any reliance on Eason's statement that he had a contract to share equally with plaintiff;[9] and (4) the claim is barred by laches.[10]

As we interpret the facts, affirmance is required on a somewhat narrower and more simple ground.

Plaintiff's claim focuses on the action taken by the board of directors on July 18, 1964. The legal effect of that action can be viewed in three different ways. As plaintiff sees it, the allocation of a specific number of shares to each of the three incorporators was wholly void; from defendants' point of view, however, that action represented either (a) the satisfaction of a preexisting obligation which, even if voidable, was subject to ratification, or (b) an offer to enter into a binding accord which, when satisfied, would discharge an incorporator's theretofore unliquidated claim for compensation for past services to the corporation.

Plaintiff does not contend that the entire action taken by the board of directors on July 18, 1964, was void. He interprets the board's action as a two-step transaction in which the board first authorized the issuance of 3,500 shares as a package to be delivered to the three incorporators collectively, and then, in the second step, undertook to divide those shares among the three joint owners. Plaintiff does not question the board's power to take the first step. He limits his claim to an attack on what he regards as an ultra vires attempt by the board to impose a binding contract on three shareholders.

Plaintiff's description of the board action as a two-step transaction is found in his brief but not in his evidence. As he points out, the board followed the ad-

---

6. If he had been entitled to more stock as claimed in Count I, and if he recovered on both counts of his amended complaint, his aggregate recovery would, of course, have been substantially larger.

7. Bowerman v. First Merchants National Bank, 211 Ind. 344, 7 N.E.2d 198 (1937).

8. Burns' Ind.Stats.Ann. § 50-418 (1964 repl.), I.C.1971, 23-4-1-18.

9. Plaintiff disputed Eason's statement at the time it was made to disinterested directors.

10. Alexander v. Phillips Petroleum Co., 130 F.2d 593 (10th Cir. 1942).

vice of counsel and limited the aggregate number of shares to be issued to the three incorporators to 3,500; but those shares were not issued to the three parties jointly. The corporate resolution unambiguously specifies the number of shares to be issued to each of the three individuals.[11]

For that action to be regarded as the issuance of a single package to three joint owners, it would be necessary to find evidence of such an interpretation either in the corporate minutes or in a preexisting agreement among the parties. There is no such evidence. The corporate resolution contains no hint that joint ownership of the shares to be issued in the names of three separate individuals was intended, and plaintiff himself denied that he had made any prior agreement with Eason or Kavanagh relating to the Unitest System or to sharing the fruits of its development.

▆▆▆ Even if, as plaintiff argues, the directors of Bio-Dynamics could not make a binding allocation of shares among the three interested parties, the board action was not a nullity. It must be regarded either as performance of an obligation to compensate each of the in-

corporators for their respective contributions to the development of the company and its products, or at the very least as an offer to enter into an accord which, when performed, would satisfy unliquidated claims for reasonable compensation. The relationship between plaintiff and the corporation imposed a duty on him either to accept or to reject that offer within a reasonable time. It was within his power to reject the offer by refusing to assign his patent application to the company, or by declining to lend his further assistance to the enterprise, except on such conditions as he might specify. Any conditional response to the corporation's offer might have constituted a counteroffer and, therefore, a rejection of its tender of 1,500 shares as payment for his "services rendered in the organization, promotion and development of the corporation and its products." [12] However, his assignment of the patent application and his acceptance of the 1,500 shares were both unconditional. His silence when he had a duty to speak, coupled with his affirmative conduct when he had the power to claim that no bargain had yet been made and to insist on more shares, amounted to an unqualified acceptance of the corporation's offer.[13]

11. The notation in the minutes of the regular directors meeting held on July 18, 1964, reads as follows:

"A motion was made by Mr. Surface that 1,500 shares each be issued to the Messrs. Kiess and Eason and 500 shares be issued to Mr. Kavanagh for services heretofore rendered in the organization, promotion and development of the corporation and its products.

"Said motion was seconded by Mr. Huddleston and adopted by a majority, 4 to 1.

"Said motion was opposed by Mr. Kiess."

12. The minutes of the meeting of July 18, 1964, indicate that these were the words used by plaintiff to describe the purpose of the issuance of the 3,500 shares.

13. By September 26, 1964, when appellant unconditionally assigned the patent application to the corporation, he was unquestionably aware of all material facts pertaining to the original issue of stock,

including the fact that the corporation intended that the number of shares allotted to each incorporator would be in full satisfaction of any claim for pre-incorporation services. Accordingly, whether appellant's acceptance is regarded as a ratification, see St. John v. Hendrickson, 81 Ind. 350, 354 (1882), Atkinson v. Atkinson, 167 F.2d 793, 796 (7th Cir. 1948), or as an accord and satisfaction, see Talbott v. English, 156 Ind. 299, 313–315, 59 N.E. 857 (1901), it forecloses plaintiff's claim that he may now assert a right to a larger portion of the corporation's original issue. The principle stated by Holmes, C. J., in Wheeler v. Klaholt, 178 Mass. 141, 59 N.E. 756 (1901), is applicable:

"The parties were not strangers to each other. The goods had not been foisted upon the defendants, but were in their custody presumably by their previous assent, at all events by their assent implied by their later conduct. The relations between the parties were so far

■ Neither plaintiff's action as a director in voting against the allocation nor his subsequent statements of dissatisfaction with the transaction militate against this conclusion. The vote related to the terms of the offer and did not preclude its subsequent unequivocal acceptance. The expressions of dissatisfaction have no greater legal significance than statements of regret about the terms of an admittedly binding contract, or adverse comment on a proposal that an offeree later decides to accept. In our view plaintiff unequivocally accepted 1,500 shares of Bio-Dynamics stock as full payment for his pre-incorporation interest in the Unitest System; and the corporation satisfied its obligation to plaintiff by the issuance of those shares.

There is no evidence that plaintiff acquired any interest, as a joint tenant or otherwise, in the shares issued by the corporation to Eason or to Kavanagh. His theory of the case is not supported by the most favorable version of the evidence. Summary judgment was properly entered on Count I.

B.

In Count II plaintiff contends that he sold his stock because he was wrongfully ousted as president. The district court held that he became ineligible to serve as an officer or director because he voluntarily sold his stock, and that his claim must therefore fail. We have arrived at the same conclusion, but by a somewhat different route.

Although plaintiff continued to hold the position of president until April, 1966, and was slated to continue in office for the balance of the year, the record supports the contention that his sale of stock was indirectly caused by the change in his status. He had the title of president, and performed many functions of the office, but after the confrontation on September 25, 1965, he no longer ran the company as its true chief executive officer.

The probationary period which followed the September 25, 1965, confrontation gave rise to the hope that he might resume his former status, and for that reason he tabled his decision to sell all of his stock. However, he had already formed the conclusion that the company could not prosper with Eason in command and, therefore, if plaintiff lost his position of leadership, he would divest himself of his interest in the company. There was a causal connection between the change in plaintiff's status and his sales of stock. We are not persuaded, however, that those sales are consequences for which defendants have any legal responsibility.

■■ Plaintiff's sincere belief in his own indispensability was apparently matched by defendants' equally sincere but opposite belief. There is no evidence that defendants' desire to remove plaintiff from a position of effective leadership was motivated by anything more than a conviction that the change would benefit the company.[14] Since directors may properly endeavor to change corporate leadership, defendants' intent to "get rid of" plaintiff was not unlawful.

Defendants' wrongful conduct, according to plaintiff's version of the evidence, comprised their false advice to Boswell

similar to those in the case cited, that if the plaintiffs' offer had been simply to let the defendants have the shoes at the price named, with an alternative request to send them back at once, as in their letters, the decision would have applied, and a silent retention of the shoes for an unreasonable time would have been an acceptance of the plaintiffs' terms, or, at least would have warranted a finding that it was." 59 N.E. at 756–757.

In this case no other finding would be consistent with the undisputed facts.

14. Which business judgment was correct is not for us to decide. The subsequent history of the company implies that defendants' position was not frivolous, but for all we know, the company might have been even more successful with plaintiff at its head. Happily, courts need not make business decisions. See Griffith v. Sprowl, 45 Ind.App. 504, 510, 91 N.E. 25 (1910).

that their initial visit had been authorized by the board, and their failure to advise the board, two days later, of their introductory meeting with Boswell. But neither the board's decision to change plaintiff's status, nor plaintiff's consequent decision to sell his stock, can be attributed to this conduct.

The board's first decision was made on September 25, 1965, and formally reconfirmed on October 1, 1965, several weeks before Boswell was approached. Although it contemplated a comparable leave-of-absence for Eason later on, the fact that plaintiff's authority was immediately curtailed, and the fact that disinterested directors then, as later, voted to limit plaintiff's responsibilities, demonstrate the accuracy of the conclusion expressed by plaintiff in his own diary on October 1, 1965, that Eason was "in" and he was "out." Plaintiff temporarily changed his mind thereafter, but the board of directors never modified its basic decision.

There is no evidence that defendants' incorrect statement to Boswell at their initial meeting on November 11, 1965, had any impact on the content of his report. Even though we accept Boswell's recollection that they advised him that formal corporate action to employ a consultant had been taken, such advice was not materially different from what might have been truthfully and properly said. The directors had agreed to study the corporation's management structure,[15] and based on their knowledge of the situation, defendants could confidently assure Boswell that his employment would receive the necessary approval. The fact that Boswell himself attached no special significance to the statement is demonstrated by his reference to the November 11 meeting in the report itself, and by his oral testimony, the candor of which plaintiff does not question.

Plaintiff's objection to the Boswell report was to its content and to the fact that Boswell was a psychologist rather than a business consultant. In October, however, his own notes suggested the desirability of advice from a psychologist with respect to the company's management problems, and he certainly knew Boswell's qualifications at the time of his own interview and testing. In any event, his attack on the Boswell report persuaded the board to appoint a new committee of three distinterested directors to make a fresh review of the situation.

■ Plaintiff was given a full opportunity to explain his position to the independent directors before Boswell was employed, during the preparation of his report, and after the report had been received. Since nothing in the record impugns the disinterested character of the other directors, and since there is no evidence that plaintiff was deprived of the right to present facts or arguments for their consideration, we are satisfied that the procedural irregularities of which plaintiff complains did not affect the substance of the corporate action. Carefully deliberated corporated decisions should not be reversed by the judiciary for reasons that amount to nothing more than "harmless error."

■ Defendants' "tortious conduct" will not support the recovery which plaintiff seeks. There are two parts to his damage claim: (1) the loss of the "prerogatives of office," and (2) "loss" resulting from his sales of stock. As to the first, he suffered no pecuniary injury prior to making the sales which disqualified him from holding office after April, 1966. As to the second, 'even though the sales indirectly resulted from defendants' actions in "getting rid" of plaintiff, their challenged conduct cannot reasonably be held to have transgressed his legally protected interest in maintaining dominion over his own property. Customary standards of business behavior would have to be made over if the

15. In his letter to the directors of September 27, 1965, summarizing the decisions made at the informal meeting on Saturday, September 25, 1965, counsel for the corporation stated that the "directors intend to study the corporation's management structure during the 180-day period beginning on September 27, 1965."

price of victory in an intracorporate fight for control included the risk of responsibility for the defeated party's investment decisions.

"[B]ecause of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics." Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting).[16]

The judgment of the district court, from a business as well as judicial point of view, is firmly supported by practical politics. It is affirmed.

16. We, of course, recognize that Judge Andrews' comment was made in a negligence context and appellant claims the benefit of more stringent rules applicable to intentional torts. However, as noted earlier, in this commercial arena the intent to bring about a change in corporate leadership does not taint otherwise lawful conduct. The same considerations that make it inappropriate to impose liability for unforeseeable consequences of negligent conduct also make it inappropriate to expand indefinitely the risks attendant upon business decision-making.